IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ROBERT LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25CV576 |
| | ) | |
| SOUTHERN HEALTH PARTNERS, | ) | |
| RODERICK C. VIRGIL, JAIL | ) | |
| ADMINISTRATOR COLLINS, | ) | |
| NURSE SHELLY, HOKE COUNTY, | ) | |
| and HARTFORD INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Robert Lewis alleges that while a pretrial detainee in the North Carolina prison system, he was transported on three occasions to Hoke County Detention Center ("HCDC") for probation violation proceedings. And, each time he was at HCDC, he received inadequate medical care. As a result, he brings this action against the defendants alleging constitutional violations pursuant to 42 U.S.C. § 1983 and state law claims of negligence and medical malpractice. *See generally* Compl., Docket Entry 2.[1]

Defendants Roderick C. Virgil and Hoke County together move to dismiss the claims against them. *See* Mot. to Dismiss, Docket Entry 14. They contend that Lewis has failed to state a § 1983 claim against them, the statute of limitations bars the claims premised on Lewis's earliest stays at HCDC, and public official immunity bars the individual capacity claims against Virgil. *See generally id.*

For the reasons stated herein, the Court should grant in part and deny in part the motion. The Court should grant in part Virgil's motion to

---

[1] Specifically, Lewis sues Roderick Virgil in his official and individual capacities, Jail Administrator Collins in her official

and individual capacities, and Nurse Shelly in her individual capacity.

dismiss the individual capacity claims against him and otherwise deny the motion.

## I. FACTS

The following facts are accepted as true and construed in the light most favorable to Lewis. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009).

Lewis alleges that he was a pre-trial detainee at least during two of his visits to HCDC because his underlying convictions were vacated in March 2022. Compl. ¶ 2. He remained in the custody of the North Carolina Department of Adult Corrections (NCDAC), though, because the NCDAC did not receive the necessary documents until 2024. *Id.* ¶ 3.

### A. June 28 to June 29, 2021

On June 28, 2021, prison guards at Nash Correctional Institution ("NCI") transported Lewis to HCDC for a probation violation hearing. *Id.* ¶ 5. Although the court continued the hearing, Lewis was not transported back to NCI and was, instead, booked overnight into HCDC. *Id.* ¶ 6. Lewis informed the booking officers "that he was an insulin-dependent diabetic prescribed to take 10 units of long acting Humulin-N insulin twice a day before eating breakfast and dinner," as well as three other medications to treat his diabetes. *Id.* ¶ 7. But Lewis did not have any of those medications with him. *Id.* He told the booking

officers that he could not stay overnight at HCDC without his medications and insulin, and he asked to see a nurse. *Id.* ¶ 8.

Officers called "Nurse Shelly" of Southern Health Partners ("SHP") to the booking room area to speak with Lewis. *Id.* ¶ 9. She told Lewis that SHP policies did not require her to conduct immediate health screenings on inmates at HCDC on writs from prison because he was only at HCDC temporarily. *Id.* ¶ 10; *see also id.* ¶¶ 11-13.

Lewis did not receive any insulin for his remaining meals on June 28 and was not permitted to check his blood sugar. *Id.* ¶ 14. The next morning, Lewis felt "dizzy and fatigued with a throbbing headache." *Id.* ¶ 15. He checked his blood sugar which was elevated at 271 mg/dL. *Id.* ¶¶ 15, 16.

SHP's medical staff and HCDC "had a wholesale, sliding scale insulin policy" according to which corrections officers delivered or distributed "prepackaged insulin needs to diabetics when their blood sugar levels rose above 200 mg/dL." *Id.* ¶ 17. Because Lewis's blood sugar was 271 mg/dL, a corrections officer obtained and gave Lewis "a syringe filled with 4-units of Humulin-R, fast acting insulin, without a doctor's order." *Id.* ¶ 18. This insulin plan "would only be effective or used to lower his blood sugar if it was above 200 mg/dL before eating a meal, but would provide him with no insulin coverage to lower his blood sugar (or

2

keep it regulated) after eating a meal." *Id.* ¶ 20.

Nurse Shelly refused to contact anyone about his medications. *Id.* ¶ 22. But the then-jail administrator had a deputy transport Lewis back to prison on June 29. *Id.* ¶¶ 23-24.

### B. May 2 to May 5, 2022

On May 2, 2022, Lewis returned to HCDC from NCI to attend the previously continued probation violation hearing. *Id.* ¶ 25. Again, the court continued the hearing, and Lewis was booked overnight at HCDC. *Id.* ¶ 26. As before, he did not have his insulin or other medications with him and received no medical evaluation. *Id.* ¶ 27. And Nurse Shelly refused to contact the prison for his medications. *Id.* ¶ 28.

Lewis told the new jail administrator, Collins, that he could not stay at HCDC without his insulin and medications and that Nurse Shelly refused to contact the prison. *Id.* ¶ 31. But there were no transportation officers to take Lewis to NCI, and Collins confirmed that she could not do anything about getting his medications. *Id.* ¶ 32. After Lewis threatened Collins with a lawsuit, she told him "that since he liked to threaten people he would not leave the Jail until she was ready for him to leave." *Id.* ¶¶ 35-36.

While at HCDC, Lewis only received insulin as part of the "wholesale, sliding scale insulin distribution policy" when his blood sugar levels rose above 200 mg/dL. *Id.* ¶ 38. And this insulin did not work in the same manner as his prescribed long-acting insulin. *Id.* ¶¶ 39-40. As a result, his blood sugar levels were "dangerously high" on May 3 and May 4. *Id.* ¶¶ 43-44.

The morning of May 3 he experienced "severe migraine headaches, dizziness and blurred vision to the point where he could not even see the picture on the television clearly – despite wearing prescription eyeglasses." *Id.* ¶ 45.

An officer escorted Lewis to the medical station to see Nurse Shelly. *Id.* ¶¶ 46-47. She refused to check his blood sugar and told him to leave "because she did not see him experiencing any observable signs of distress." *Id.* ¶ 48. However, upon his return to the housing unit, the officer allowed him to check his blood sugar which was 302 mg/dL. *Id.* ¶ 49. As a result, Lewis received insulin as part of the "wholesale, sliding scale policy." *Id.*

On May 4, Lewis "experience[ed] pain all over his body; severe migraine headaches, dizziness, blurred vision and numbness and tingling sensations in his hands and feet." *Id.* ¶ 50. He convinced an officer to allow him to check his blood sugar which was 333 mg/dL. *Id.* ¶¶ 52-53. The officer took him to the medical station to see Nurse Shelly who "had no choice but to give Mr. Lewis 6-units of insulin." *Id.* ¶ 54. While there, Lewis

3

also told Nurse Shelly of his "severe case of acid reflux" that required "his prescribed acid reflux medication." *Id.* ¶ 62. He threatened her with a lawsuit, and she told him "she was not writing anything down for him to use against her." *Id.* ¶ 64.

On May 5, a deputy took Lewis to the Johnston County Detention Center for a court appearance. *Id.* ¶ 65.

### C. June 27 to July 1, 2022

Lewis returned to HCDC from NCI on June 27, 2022 for the previously continued probation violation hearing. *Id.* ¶ 67. As before, the court continued the hearing, and Lewis was going to be booked overnight in HCDC. *Id.* ¶¶ 68-69. He told Collins that he did not want to be booked into HCDC because the prison had yet again failed to send his insulin with him. *Id.* ¶ 71.

But Collins told him there were no transportation officers who could return him. *Id.* ¶ 72. Nurse Shelly again refused to contact the prison for his medications and would not have a SHP doctor order any. *Id.* ¶ 73.

As a result, Lewis's blood sugar levels were "dangerously high everyday" he was at HCDC "because the sliding scale insulin was not providing enough coverage" and "Nurse Shelly was delaying delivery of his diabetic meds by at least 5 to 6 hours they were

prescribed to be taken – making them ineffective." *Id.* ¶ 76.

His blood sugar level was (in units of mg/dL) 278 on June 27; 298, 202, and 287 throughout the day on June 28; 302, 272, and 414 throughout the day on June 29; and 287, 312, and 347 throughout the day on June 30. *Id.* ¶ 77. "Every day that Nurse Shelly passed out Mr. Lewis' diabetic meds he told her that he had vomited on two occasions and was experiencing severe migraine headaches, dizziness, nausea and blurred vision." *Id.* ¶ 78.

He also reported to her "severe choking sensations at night" from his untreated acid reflux. *Id.* ¶ 79. Although Nurse Shelly told him the prison never sent that medication, Lewis had seen it inside a bag the prison had given booking officers at HCDC. *Id.* ¶ 80. When Lewis complained of the delayed insulin and the lack of acid reflux medication, Collins told him "that he was getting what he deserved by threatening to sue every time he came to the Jail." *Id.* ¶ 81.

Lewis left HCDC on July 1, 2022. *Id.* §§ IV.B., IV.C.

### D. Claims against Roderick C. Virgil and Hoke County

As is relevant here, Lewis alleges that Roderick C. Virgil, as Sheriff of Hoke County, and Hoke County are liable for "denial of adequate medical care," understood to be a claim pursuant to

4

42 U.S.C. § 1983 for deliberate indifference to Lewis's serious medical needs in violation of the Fourteenth Amendment.

Specifically, Virgil, whom Lewis sues in his individual and official capacities, is allegedly liable because of "his policy or custom of understaffing in available transportation officers," which caused Lewis's "punitive detainment . . . without access to his prescribed diabetic meds, insulin, and severe acid reflux medications . . . ." *Id.* ¶ 87.

And both Virgil and Hoke County are allegedly liable because HCDC adopted SHP's "unconstitutional policies" which "denied intake medical screenings . . . ; denied verifications of [Lewis's] prescribed medications . . . ; and permitted a practice or custom that required diabetics to receive insulin under a sliding scale policy – to be distributed to [Lewis], without a doctor's order, at the direction of nonphysicians and/or nonmedical detention officers . . . ." *Id.* ¶ 88.

Lewis also claims that Virgil and Hoke County are liable for negligent failure to provide adequate healthcare, presumably a negligence claim under state law. *See id.* ¶ 97.

Virgil and Hoke County argue that Lewis has failed to state a § 1983 claim, the statute of limitations bars consideration of the first two stays at HCDC, and the claims against Virgil in his individual capacity fail. *See*

*generally* Mem. of Law in Supp. of the Rule 12(b)(6) Mot. to Dismiss ("Mem. in Supp."), Docket Entry 15.

## II.   STANDARD OF REVIEW

To state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting and citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). That is, a plaintiff must make factual allegations that are "enough to raise a right to relief above the speculative level." *See Bell Atlantic Corp.,* 550 U.S. at 555 (citation modified). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Walters v. McMahen,* 684 F.3d 435, 439 (4th Cir. 2012) (quoting *Twombly,* 550 U.S. at 570).

The Court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff, but does not consider legal conclusions, elements of a cause of action, and bare assertions devoid of factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd.*, 591 F.3d at 255. A *pro se* plaintiff's complaint must be construed liberally in his favor. *See Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015).

5

## III. DISCUSSION

A. The § 1983 claims against Virgil in his official capacity and Hoke County survive dismissal.

Lewis alleges that Virgil and Hoke County are liable for their failure to provide him adequate medical care at HCDC. Not long ago, the Fourth Circuit Court of Appeals defined the elements of a pre-trial detainee's deliberate indifference claim. *See Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023). Unlike a convicted detainee, a pre-trial detainee need not "show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Id*. at 611.[2]

Instead, to state a claim for deliberate indifference to a serious medical need, a pre-trial detainee must sufficiently allege

that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed;

(3) the defendant knew or should have known (a) that the detainee had the condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed."

*Id*. Stated differently, a plaintiff must "show that the defendant's action or inaction was, in *Kingsley*'s words, 'objectively unreasonable,' 576 U.S. [389,] 397 [(2015)]: that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly." *Id*. But it is "not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." *Id*. at 611-12.

As relevant here to claims against the county and Virgil in his official capacity as sheriff, "[f]or purposes of § 1983, a municipality is considered a 'person' and thus is subject to suit." *Hunter v. Town of Mocksville*, 897 F.3d 538, 553 (4th Cir. 2018) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978)). However, a city cannot be *vicariously* liable for the acts of its employees. *Id*. at 553-54. "Rather, 'it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly

---

[2] At this stage of the litigation, the Court accepts as true Lewis's status as a pre-trial detainee. However, if the evidence shows that Lewis was a convicted detainee at the relevant times, he will

have to meet the Eighth Amendment standard for deliberate indifference which has a subjective prong, in addition to the objective prong described here.

be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.'" *Id.* at 554 (quoting *Monell*, 436 U.S. at 694).

In other words, "municipal liability under Section 1983 attaches only to 'action [taken] pursuant to official municipal policy of some nature.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986)). A single decision may create an official policy "so long as that governmental unit possessed 'final authority to create official policy.'" *Id.* (quoting *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)).

"'The question of who possesses final policymaking authority is one of state law.'" *Id.* at 555 (quoting *Riddick v. Sch. Bd.*, 238 F.3d 518, 523 (4th Cir. 2000)). Courts "'must look to the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law.'" *Id.* (quoting *Riddick*, 238 F.3d at 523). A "municipality may delegate its final policymaking authority to other officials or governing bodies." *Id.*

As applicable to Virgil in his individual capacity, it is black letter law that a theory of *respondeat superior* generally does not apply in § 1983 claims against defendants in their individual capacities. *See Monell*, 436 U.S. at 694. However, a plaintiff can assert a viable claim against a supervisor upon a showing:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotations and citations omitted). As to the "pervasive and unreasonable risk" element, the plaintiff must allege that it was "widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *See id.*

Here, Virgil, (presumably in his official capacity) and Hoke County contend that Lewis's allegations do not sufficiently allege a § 1983 claim of deliberate indifference to his serious medical needs. *See* Mem. in Supp. at 13. This is so because, as they argue: (1) as pled, Lewis merely

7

disagreed with his treatment, which is insufficient to state a § 1983 claim; (2) even so, HCDC's detention officials are not responsible for the decisions of the medical professionals and are permitted to rely upon their medical judgment; and (3) any intentional delay on the part of the detention officials (which they deny) did not cause Lewis serious or significant injury. *Id.* at 13-16.

Notably, the moving defendants here do *not* argue that *Monell* precludes Lewis's claim against them.

   1. Lewis states a claim of deliberate indifference.

Lewis has alleged more than his disagreement with his medical treatment. True, such a disagreement is insufficient for a § 1983 claim. *See, e.g., Hixson v. Moran*, 1 F.4th 297, 302-03 (4th Cir. 2021) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970) (noting that exceptional circumstances are those in which medical care is "so grossly incompetent, inadequate or excessive as to shock the general conscience or to be intolerable to fundamental fairness"))).

But, here, Lewis alleges much more than mere disagreement. He claims that he was without his prescribed 10 units of long acting Humulin-N insulin twice a day before eating, among other medications. He did not simply disagree with the provision of the 4 units of Humulin-R fast acting

insulin; it did not effectively treat his diabetes like his prescribed insulin did. For example, even after receiving this prepackaged insulin, it provided him no insulin coverage to lower his blood sugar or regulate it after eating a meal. As a result, his blood sugar levels were repeatedly dangerously high and caused him various symptoms. It was only after his blood sugar was 333 mg/dL that Nurse Shelly even gave him 6 units of insulin.

Even with this knowledge, Nurse Shelly would not contact the prison or have an SHP doctor order Lewis's prescriptions when he returned to HCDC without them a third time. As expected, Lewis's blood sugar levels were dangerously high every day because the prepackaged insulin still did not effectively treat his diabetes and Nurse Shelly further exacerbated the problem by delaying by five or six hours the provision of his other diabetic medications. His blood sugar levels ranged from 202 to 414 mg/dL during this third stay. He reported to Nurse Shelly that he had vomited twice and was suffering severe migraines, dizziness, nausea, and dizziness.

In sum, Lewis sufficiently alleged that he had a medical condition that posed a substantial risk of serious harm (diabetes). *See Scinto v. Stansberry*, 841 F.3d 219, 230 (4th Cir. 2016) (noting, in ruling that an inmate lodging a Section 1983 claim for denial of insulin need not produce expert testimony of a diabetic's need

8

for insulin to survive summary judgment, that it is a "[w]ell-known fact that diabetes is a common yet serious illness that can produce harmful consequences if left untreated for even a short period of time") (internal quotations and citation omitted).

Nurse Shelly (on whom these excerpted allegations focus, but possibly other defendants) intentionally, knowingly, or recklessly acted or failed to act to address the risk that diabetes posed for Lewis. She knew Lewis had diabetes and knew or should have known that her actions or inactions posed an unjustifiably high risk of harm. And, as a result, Lewis was harmed.

2. Non-medical detention officials are entitled to rely on the medical judgment of medical professionals.

Indeed, as long as detention officials ensure that medical professionals attend to a detainee, they are entitled to rely on the medical judgment of those medical professionals. *See Dale v. FNU Barnes*, No. 1:23CV373, 2024 WL 4416440, at *10 (M.D.N.C. Oct. 4, 2024) (quoting *Pulliam v. Super. of Hoke Corr.*, No. 1:05CV1000, 2007 WL 4180743, at *6 (M.D.N.C. Nov. 20, 2007), *report and recommendation adopted*, (M.D.N.C. Nov. 18, 2024)). In other words, "[i]f a prisoner is under the care of medical experts . . . , a nonmedical prison official will generally be justified in believing that the prisoner is in

capable hands." *Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Non-medical detention officials "are not responsible for determining the course of treatment or for overruling the opinions of those professionals." *Dale*, 2024 WL 4416440, at *10.

Lewis argues that the detention officers should not have relied on Nurse Shelly because "he was never once screened or evaluated by Nurse Shelly to determine what his immediate medical needs and prescribed treatment would be." Pl.'s Resp. to Defs.' Mot. to Dismiss ("Resp. in Opp'n") at 2, Docket Entry 23. But he does not allege that any detention officer failed to provide him or stymied his access to those evaluations or to Nurse Shelly. Furthermore, the detention officers were not required to determine Lewis's course of treatment in the absence of Nurse Shelly's having done so or to overrule her opinions about that treatment. *See Dale*, 2024 WL 4416440, at *10.

As alleged here, the detention officers were entitled to rely on Nurse Shelly's medical judgment in her medical treatment of Lewis. However, none are named as defendants in this action, and Virgil does not argue that *he* is protected from liability for such

reliance, so the argument does not warrant dismissal of the claim.

3. The detention officials did not intentionally delay Lewis access to care.

There are no allegations that detention officials intentionally delayed Lewis access to medical care. Quite the opposite: he alleges that when he told the booking officers during his first trip to HCDC that he could not stay overnight without his prescription medications and asked to see the nurse, they called Nurse Shelly to the booking room to speak with Lewis. He also alleges that, at other times, various detention officers allowed him to check his blood sugar, took him to see Nurse Shelly for treatment of high blood sugar symptoms, and provided him the prepackaged insulin.

In sum, Lewis has sufficiently stated a § 1983 deliberate indifference claim. But the detention officers at HCDC were entitled to rely on Nurse Shelly's medical judgments in treating Lewis.

4. The § 1983 claim against Virgil in his official capacity and Hoke County survives.

As referenced above, Virgil and Hoke County challenge the claim on only three grounds: 1) Lewis's mere disagreement about his medical care (which fails as a matter of law); 2) detention officers' entitlement to rely on medical judgments (which is inapplicable to Virgil and the county);

and 3) non-actionable delay (again, inapplicable to Virgil and the county).

But neither attempts to connect the three challenges above to either of them to justify dismissing this claim *against them*. They have not argued that the detention officers' entitlement to rely on Nurse Shelly's medical judgments or the lack of delay supports dismissal of this claim against either of them.

Further, Virgil in his official capacity and the county do not advance a *Monell* defense and, indeed, "the Court will not develop Defendants' argument for them," *Sterling v. Ourisman Chevrolet of Bowie Inc.*, 943 F. Supp. 2d 577, 602 (D. Md. 2013).

Accordingly, these claims against Virgil and the county survive.

B. The statute of limitations does not bar Lewis's claims at this stage.

Lewis filed this action on July 1, 2025. Accordingly, Virgil and Hoke County contend that all but the last visit to HCDC are time-barred.

The statute of limitations for a § 1983 claim arising in North Carolina is three years. *See Tommy Davis Constr., Inc. v. Cape Fear Pub. Util. Auth.*, 807 F.3d 62, 66-67 (4th Cir. 2015) (borrowing the statute of limitations for a § 1983 claim from

10

North Carolina's three-year personal injury limitations period).

But federal law governs the accrual of the § 1983 claim. *See Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1162 (4th Cir. 1991). "A Section 1983 claim of deliberate indifference ordinarily accrues when a plaintiff becomes aware or has reason to know of the harm inflicted." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018).

"[S]ince a Rule 12(b)(6) motion aims to test the sufficiency of the complaint, and the burden of proving an affirmative defense rests with a defendant, dismissal under Rule 12(b)(6) on the statute of limitations occurs in 'relatively rare circumstances.'" *Dickinson v. Univ. of N.C.*, 91 F. Supp. 3d 755, 763 (M.D.N.C. 2015) (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007)). "To succeed on a statute-of-limitations defense at this stage, all facts necessary to show the time bar must clearly appear 'on the face of the complaint.'" *Id.* (quoting *Goodman*, 494 F.3d at 464).

Virgil and Hoke County argue that each of Lewis's three visits to HCDC is its own discrete alleged violation and, thus, each claim accrued when he left HCDC and returned to prison. *See* Mem. in Supp. at 18-20.

Lewis asserts that his three stays at HCDC constitute "a continuing wrong violation tolling the limitations period from the finality of the last wrongful act," which would be July 1, 2022

when he left HCDC for the last time. Resp. in Opp'n at 4. This is because the treatment at HCDC "was identical, deliberate and ongoing." *Id.*

To rely on the continuing violation principle, "the plaintiff must establish that the unconstitutional or illegal act was a . . . fixed and continuing practice." *Nat'l Advert. Co.*, 947 F.2d at 1166. He "must (1) identify a series of acts or omissions that demonstrate deliberate indifference to his serious medical need(s); and (2) place one or more of these acts or omissions within the applicable statute of limitations for personal injury." *DePaola*, 884 F.3d at 487. "The statute of limitations does not begin to run on such a claim . . . until the date, if any, on which adequate treatment was provided." *Id.*

But a plaintiff may not take advantage of this doctrine if his claims "are based on discrete acts of unconstitutional conduct, or those that fail to identify acts or omissions within the statutory limitation period . . . ." *Id.* (citation omitted).

This is not the typical case in which a detainee claims a continuing violation. Understandably, Virgil and Hoke County argue that there is no continuing violation here because "BEFORE, BETWEEN, and AFTER each such period of time [that Lewis was at HCDC] [he] was incarcerated in a state prison more than 135 miles away under the care, custody, and control of the [NCDAC] . . . ." Mem. in Supp. at 19. This is an attractive

argument. *Cf. Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) ("This refusal continued for as long as the defendants had the power to do something about his condition, which is to say until he left the jail.").

But it lacks support. Specifically, Virgil and Hoke County rely on a Third Circuit case from 1981 as proof that Lewis merely alleges "isolated, separate, and discrete acts[.]" *See* Mem. in Supp. at 19 (citing *Jewett v. Int'l Tel. and Tel. Corp.*, 653 F.2d 89, 91 (3d Cir. 1981)). *Jewett* is an employment discrimination case where the plaintiff alleged, as a continuing violation, a handful of discrete actions her employer took, some of which occurred outside of the operative limitations period, tied together by the plaintiff's ensuing mental health crises in response thereto. *Id.* at 92. While the district court found a pattern and practice of discrimination, the Third Circuit disagreed, ruling that the plaintiff's personality disorder "during the operative period cannot, alone, support a finding that there is a continuing violation of Title VII." *Id.* at 93. At best, it would "be evidence that the effects of a past violation continue, not that the violation itself continues." *Id.*

Here, the effects of HCDC's denial of insulin immediately abated once Lewis received competent care; unfortunately, every time he returned there, he was denied competent care once more. *Jewett* is thus inapposite. Virgil and Hoke County note this fact,

arguing that because the statute of limitations begins to run when the detainee receives adequate treatment, the limitations period began running each time Lewis returned to prison where he was, inferentially, receiving adequate care. *See* Mem. in Supp. at 19-20 (citing *DePaola*, 884 F.3d a 487).

Had Lewis alleged different conduct by different individuals during each of his stays at HCDC, this argument might gain more traction. For example, the court in *Anselme v. Fluvanna Corr. Ctr. for Women*, No. 3:20-cv-5, 2020 WL 7407467, at *3 (W.D. Va. Dec. 17, 2020), found no continuing violation under those circumstances. Two female plaintiffs sued their prison facility, the warden, and three other prison officials pursuant to § 1983. *Id.* at *1. The first incident involved Officer Griffin sexually assaulting plaintiff 1 on April 8, 2017 and then subjecting her to psychological abuse with sexual comments about which she filed a formal grievance on May 24, 2017. *Id.* The second incident with another officer, in October 2018, did not involve a constitutional violation. *Id.* at *2. The third incident involved Officer Rumsey raping plaintiff 2 on November 20, 2019. *Id.* at *2.

The court determined that the continuing violation doctrine did not apply and the statute of limitations barred claims related to Griffin's assault of plaintiff 1. *Id.* at *2-3. "[T]he behavior in question occurred over the course of three years,

12

included three different parties, and involved three substantively different types of misconduct, prompting different responses from [the prison]." *Id.* at \*3.

Here, Lewis alleges the same actors, the same acts or omissions, and the same injuries, across each of his three stays at HCDC.[3] Specifically, he alleges that each time he was at HCDC (including the third visit which extends into the statutory period), the same unconstitutional policies existed, Nurse Shelly acted pursuant to those policies when she refused to obtain Lewis's medically necessary insulin from the prison, the prepackaged insulin distributed pursuant to policy was ineffective at treating his diabetes, and Nurse Shelly was aware of its lack of efficacy and the resulting symptoms Lewis experienced.

In sum, he has sufficiently alleged a fixed and continuing practice. *See Nat'l Advert. Co.*, 947 F.2d at 1166. He "identif[ied] a series or acts or omissions . . . demonstrat[ing] deliberate indifference . . . ." *DePaola*, 884 F.3d at 487; *see also Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009) ("To assert a continuing violation for statute of limitations purposes, the plaintiff must allege both the existence of an ongoing policy of [deliberate indifference to his or her serious medical needs] and some non-time-

barred acts taken in furtherance of that policy.") (citation omitted and alteration in *Shomo*) *cited in DePaola*, 884 F.3d at 487.

At this Rule 12(b)(6) stage, Lewis has sufficiently alleged facts supporting a continuing violation such that the statute of limitations does not bar consideration of any of the alleged unconstitutional conduct.

> C. The Court should dismiss the individual capacity claims against Virgil.

Virgil also moves for the dismissal of the individual capacity claims asserted against him pursuant to § 1983 and state law.

As for the § 1983 claim, Virgil argues that Lewis did not allege that he personally participated in the constitutional violations. *See* Mem. in Supp. at 21. Indeed, for an individual to be liable under § 1983, he must have "'acted personally in the deprivation of the plaintiff's rights.'" *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)).

Lewis does not allege that Virgil was ever present at HCDC when he was there. Lewis attempts to hold Virgil liable simply because he was sheriff of Hoke County and the alleged final policy-maker for HCDC. None of

---

[3] And this dovetails with the pattern and practice allegations that would defeat any *Monell* defense that Virgil in his official

capacity or the county would have mounted, *see supra* § III.A.4.

13

these actions support Virgil's personal liability for alleged constitutional violations. Lewis did not address this challenge in his response in opposition to the motion to dismiss, perhaps because he did not intend to allege the § 1983 claim against Virgil in his individual capacity. *See* Compl. ¶¶ 87, 88.

Virgil also moves to dismiss the state law claim against him, arguing that he is entitled to public officer/official immunity. *See* Mem. in Supp. at 22. Lewis contends that Virgil waived immunity when he purchased liability insurance. *See* Resp. in Opp'n at 5.

Lewis brings a claim for negligent failure to provide adequate healthcare against all the defendants (which is separate from the medical malpractice claim he asserts against SHP and Nurse Shelly).

"For over a century, North Carolina has recognized an immunity for public officials charged with negligence in the performance of their duties." *Thomas v. McFadden*, 810 F. Supp. 3d 732, 747 (W.D.N.C. 2025). A sheriff is a public official for purposes of public official immunity. *See Hensley on behalf of North Carolina v. Price*, 876 F.3d 573, 587 (4th Cir. 2017) (applying North Carolina law).

"Public official immunity, a judicially-created doctrine, is 'a derivative form' of governmental immunity which shields public officials from personal liability for claims arising from discretionary acts or acts constituting

mere negligence, by virtue of their office, and within the scope of their governmental duties." *Bartley v. City of High Point*, 873 S.E.2d 525, 533 (N.C. 2022).

Correspondingly, a public official will not be immune if his "action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Id.* (quotations and citation omitted). To act with malice is to act wantonly "contrary to the actor's duty" with the intention to injure another. *Thomas*, 810 F. Supp. 3d at 748 (explaining that the actor's intent can be constructive where it "is so reckless or so manifestly indifferent to the consequences, where the safety of life or limb is involved").

Here, there is no allegation that Virgil acted outside the scope of his official authority, or acted with malice, or intended to injure Lewis. And Lewis does not dispute this in his response; instead, he focuses solely on the purchase of liability insurance.

Unlike public official immunity which protects public officials from *personal* liability, governmental immunity protects counties and thus county actors sued their *official* capacities from liability. *See Hart v. Brienza*, 784 S.E.2d 211, at 215-17 (N.C. Ct. App. 2016). And it is governmental immunity that a county can waive under certain circumstances with the purchase of liability insurance. *See id.* at 216-17. Lewis's argument that Virgil waived public official immunity with the purchase of liability

14

insurance is, therefore, misplaced. Public official immunity protects Virgil from individual liability for any alleged negligence.

Accordingly, the Court should grant Virgil's motion to dismiss the individual capacity claims asserted against him.

## IV. CONCLUSION

It is hereby **RECOMMENDED** that the Court **GRANT IN PART AND** **DENY IN PART** Roderick C. Virgil and Hoke County's Motion to Dismiss in that it is **RECOMMENDED** that the Court grant Roderick C. Virgil's motion to dismiss the individual capacity claims asserted again him and otherwise **DENY** the motion.

_____
JoAnna Gibson McFadden
United States Magistrate Judge

August 6, 2026
Durham, North Carolina

15